All right, Mr. Fasold. May it please the Court, my name is Mark Fasold. I represent the appellant. With regard to appellate jurisdiction? Let me ask, I read your supplemental letter, and it seems to me you have a few arguments, but maybe your main argument is that these claims that were dismissed without prejudice were sort of inextricably tied in. Basically, they were doomed because of the two summary judgment rulings, so they are tied up in the summary judgment rulings. So then my question is, after losing the two summary judgment rulings, all you had to do was say, District Court, this defeats all our claims. Enter a judgment dismissing all claims with prejudice, with prejudice, because of your summary judgment rulings. Then you appeal, and if you win here, everything gets reinstated when you go back down. So why wasn't that the proper procedure, if you're right, that all these claims were doomed to fail because of the summary judgment rulings? In the event of a reversal, we didn't want to come back down and have to worry about the Court saying, well, you waived because you acquiesced as to that fifth claim. All that be as it may, Rule 41A1, according to Footnote 2 of Ryan, in addition to the Eleventh Circuit and Schumacher, says that 41A1 enables the dismissal of an action, not a fragment of an action, to use the… I looked at that case, Lal, but here all that was left was the one claim, so you were dismissing the rest of the action. Because 41A1 does not enable the dismissal of only one of five claims. And so at the time that the… Well, it doesn't at the beginning of a lawsuit, but if only one is left, if the Court throws out four of my claims on summary judgment or Rule 12 and there's one claim left, then I can dismiss under 41 because that's the case. True. Right? It's a one-claim case at that point. Well, at the time that the stipulation was entered was before final judgment had been entered. So at the time that the stipulation was entered, that was an ineffectual dismissal of that fifth claim. So that claim was part of the complaint at the time that the Court entered final judgment and said that the plaintiff take nothing by its suit, that the action be dismissed on the merits, and that the Court denies all relief not granted. And so regardless, there is a res judicata effect as to that fifth claim. What was the fifth claim? A statutory, right? Statutory, yes. For what? Texas Insurance 21.21. I don't need – what was the substance? Bad faith. Bad faith. Right. And so if there was no duty to defend, how is there bad faith? Well, so there's the Menchaca v. USA case talks about – Because you investigated slowly or things like that? That's right. Okay. But it's not clear – So you could have won that. You could have won that claim even after losing the summary judgments. Could have. Okay. But you chose to dismiss it without prejudice so you could save it for later. So that solely in the event of a reversal, we wouldn't be alleged to have or claimed to have waived that – Why do you say solely in the event of a reversal? On a dismissal without prejudice, you can reassert it regardless. No, not where we have – You're saying because you'd be issue precluded. Because res judicata precluded. We would not be able to assert this final judgment entered by the district court before we ever bar that claim in any other action. Because it could have been brought in this claim. That's correct. With regard to the – Why isn't that true in all these other cases where we've applied this rule? Well – That res judicata would have barred the claims that were dismissed. So in Ryan, there was no final judgment that had that effect. In Marshall, there was no final judgment that had that effect. In – What do you mean you say had that effect? So there was no final judgment that said the action is dismissed on the merits. There is no final judgment that says that all relief not granted is denied. So in none of those cases was there that. This case is unique because you have a final judgment that dismisses everything on the merits and forever precludes that fifth claim from being brought. With regard to fully adversarial proceeding, the Texas Supreme Court said in Hamel, if no pretrial agreement, then there's a strong presumption of a fully adversarial proceeding. A trial is not required. This court held that in JHP and enforced a default judgment. Here the district court expressly found there was no pretrial agreement. Let me ask you about the procedural history of this case. The court first rules no duty to defend, which I take it also – and to indemnify. So why was this – the existence of this judgment – that gets decided later on summary judgment, whether the state court judgment was valid or adversarial. Why did that still matter? After the court's already said you have no duty to defend or to indemnify, why was this still – what did this issue affect? It may have had some relevance to the statutory claim. In what way? That the underlying judgment might be binding in that situation. What are the penalties for the statutory claim, or what's the remedy if you'd won that? They'd be compensatory damages. That could include the underlying judgment. Even though they had no duty to indemnify for that. Correct. It's not apparent to me how that's the case. So here the district court found that there was no pretrial agreement, so the burden of proof shifted to Ace to show that Espada had no, meaning zero, meaningful incentive to ensure that the judgment accurately reflects the plaintiff's damages. The touchstone is incentive, not ability. Ace's sole proof to overcome the strong presumption was Espada's financial position. The Texas Supreme Court in Hamel in footnote 9 says that's not dispositive. And the second was Espada's officers' failure to attend the trial. But those officers testified that they did not attend trial because they knew that a corporation could not be represented by non-attorneys. So that proof, Espada's financial position and the failure of the officers to attend trial, is illegitimate. So we have a strong presumption of a fully adversarial proceeding, and CBX produced evidence that Espada fought Ace's decision to withdraw, they attempted to hire counsel, and they explained all the reasons why they wanted to continue to do business. And Espada faced an actual risk of liability. Six abstracts of judgment had been filed in counties in which they were believed to have an interest in assets. Now, with regard to J-5, the clerk handed the panel a handout, and it's the UREC endorsement. So the UREC endorsement is two pages long. We know from TIG versus San Antonio YMCA that endorsements generally add coverage. And here we know this one adds coverage because it's expressly called a coverage endorsement. Here at the bottom of the first page, it says the following provisions are added, and there's three provisions, and they begin with Roman numerals. Roman numeral number one adds coverage. Roman numeral number two changes an exclusion of J-4. Roman numeral number three adds definitions. But back to Roman numeral number one, it says as a negative pregnant, we will pay under coverage A for the sum of damages because of all property damage included within the underground resources hazard. Now, at the outset, it's important to note B here, Roman numeral one B. The second sentence says any payment for property damage under this endorsement. So a payment for property damage can just be made based on these two pages. And all that needs to happen for a payment to be made underneath this endorsement is that there be any property damage included within this definition down here of underground resources hazard and arising out of operations. Only two things. The words all here, all property damage, and the word any here about underground resources includes property damage to any of the following negates J-5. Okay, J-5 is one of the six different ways property damage is excluded. The words all and any here negate all of those grounds for exclusion. Now, similarly, so that's J-5. Does J-5 apply? It also doesn't apply based on the plain language. This court in Bayrock, considering similar language, and the important language is that particular part. Okay, J-H-P and this court in Bayrock said that you must break down the components of the operation to determine what is that particular part. And here we have two different occurrences, the frac job theory and the pool theory. Now, under the frac job theory, that particular part is the completion liner. That's a 2-1⁄2-inch tubing that goes within the 5-1⁄2-inch casing. That 5-1⁄2-inch casing goes within the 9-5⁄8-inch surface casing. So the excluded property under the frac job theory would only be the completion liner. The excluded property underneath the pool theory would be the 5-1⁄2-inch casing because that was the casing that was being pulled out when the fracture was discovered. Now, on to professional services exclusion. And again, this coverage part, it requires that this damage arise out of your operations. And here on the first page, they describe what those covered operations are. The covered operations include recovery of casing. Okay, so that's the pool theory. Shooting, that's the frac job theory. So the very operations that Ace claims were professional services are actually the services that are covered that must be the predicate of this coverage. So the professional services exclusion as to the UREC endorsement is superseded. The professional services exclusion is also not applicable because in the petition, plaintiff alleged that Espada was hired to drill, operate, implement. This court in Wilbro said drilling, constructing, and operating are not professional services. This court in DP Engineering said execution of the plan or implementing, which is the very thing that Espada was hired to do, is not a professional service. In conclusion, we believe that coverage was owed. For over two years, Ace defended Espada. And 71 days before trial, they withdrew coverage and withdrew the defense. What if any attempt was made to show that the fact that Ace defended Espada for two years  was there any attempt to show that? To say, well, based on the fact they provided defense for two years, that should be considered in deciding what? It just provides context. I don't know that it's an element of any of the claims, Your Honor. It provides context about was there coverage? Well, obviously they thought that there was coverage for two years. And I think that under the UREC endorsement, clearly there's coverage up to $1 million for any property damage for the very services that they claim now are professional services. With that, Your Honor, I'll yield my time. Mr. Lane. Thank you, Your Honor. May it please the Court, Neil Lane for Ace American Insurance Company and Ace Property and Casualty Insurance Company. Let me first address the issue that was raised early in the argument and which was brought to the party's attention just a couple of weeks ago. We submitted briefs on this point. The reality is that we submitted a joint status report to the court. It's a record on appeal 5349-5351. And in that we stated that it was believed that at least CBX believed that the claim under the insurance code was viable, but that the rulings had significantly limited the damages that it could obtain. And therefore, subsequently, it stated that CBX would voluntarily dismiss its claim and that if this case was remanded, we wouldn't object, that is the defendants wouldn't object, to them reasserting their insurance code claim. And then the judgment was entered. The judgment does not mention anything about 54B. It doesn't make any statement to the effect that there was no just reason for delay. And so the issue before the court really is, if you find that in this circumstance this appeal can proceed under 54B as a certified final judgment for purposes of 54B, well, what is the rule then in the Fifth Circuit? Because there's no mention of it. There's no certification. There's no apparent intention on the part of the district judge to make that finding. And so that seems to me, having now studied the issue, that that is the issue for the Fifth Circuit, that you don't want to have piecemeal appeals. You don't want to have a case come up now on these issues as to J-5 and the professional services exclusion and so forth, then go back down and the next appeal will be about the insurance code if the court finds that the insurance code was not violated or does not apply and there will be a separation. I took the other side's argument to be that even though it was dismissed without prejudice, effectively it is a dismissal with prejudice because they would be precluded from pursuing it if this becomes a final judgment. What's your response to that? Well, the most important thing for purposes of this court is that we said in our joint status report that they intended to reassert it if there was a remand and they would assert it in the district court and it could be subject to appeal then to the Fifth Circuit. And that is the very definition of a piecemeal appeal. That would be coming up again in a second appeal. So that is the problem. And the question is, here were the damages significantly limited by virtue of the motion for summary judgment orders? That's true. That was in our stipulation. But the reality is there are viable claims. They were significantly limited. They certainly weren't $105 million claims. I don't believe that the ones here were $105 million claims. But in any event, it seems to me that there's a bit of a box there based on the prior rulings of this circuit and that if that's going to change, I think that this panel is bound by that ruling just as I believe it was Judge Haynes in her concurrence in Williams pointed out.  And in this case, I do think absent that certification, it's binding. There's no pellet jurisdiction in this case. Let me talk about— Walk us through the procedure a little bit because this gets mighty mushy. There were five claims? There were, Your Honor. The court ruled against CBX on all five? Yes, Your Honor. So CBX voluntarily— No, no, no, not on all five. I apologize, Your Honor. The court ruled on—really the court has two orders. One goes to the two exclusions, the professional services exclusion and the J-5 exclusion. It said the claims against Espada were excluded by the policy. The second order had to do with the admissibility and binding nature, whether the $105 million judgment was admissible and binding. Those taken together neither addressed the insurance code violation. And what was referred to— When you say insurance code violation, we're talking about what's referred to as the fifth claim? Yeah. The bad faith claim? Yes. Well, it's not the bad faith claim. Bad faith in the state of Texas, absent coverage, there's no bad faith. There's no breach of a duty of good faith and fair dealing. Let's start again. It's actually a statutory claim. So let me give you an example because they had a laundry list of violations that they said. They said, for instance, the insurance company didn't send a reservation of rights letter. For instance, the insurance company made certain representations. You'll see it in the complaint. They're listed, various different provisions. Now, what the state of Texas, the Supreme Court, has said in Manchac, which was referred to earlier, is that you can have an independent claim for violation of the insurance code, even if there's no coverage, but that you have to prove an independent damages. You have to prove that independently damages result. Because that's why I don't see why this ruling on the validity of the state court judgment doomed their statutory claim. I don't believe it. Because that wouldn't be the remedy for the statutory. It has to be independent injury. The statute is independent, and we actually said in our joint status report they had a viable insurance code claim. But we noted they believed that they had one. I don't want to say that I believe they had one, but they believed they had one, and they believed that the rulings limited their damages, didn't destroy their damages, didn't destroy their cause of action, didn't eliminate it. They said it limited the damages they could recover. So they said we're going to dismiss this under 41, and we're going to take it up on appeal. And that's the issue before this court is whether there's appellate jurisdiction over that appeal by virtue of that. So, yes, Your Honor. Again, the claim that is on appeal now, if we say there is no jurisdiction for us to consider that claim, what happens to that claim? If there is no appellate jurisdiction, this appeal must be dismissed. The appeal will be dismissed, and it goes back to the district court. Well, that is the troubling aspect of this doctrine, which has been referred to as the finality trap. Does it go back to the district court? What is the case or controversy that remains? All the claims have been either dismissed or there's been a final judgment. And that is a quandary. You'd ask the prior counsel whether they were responsible for the briefs, and I was responsible for every word in these briefs, okay? I did not see this finality trap until we got here to the court. We didn't raise it in our briefs. But it seems to be that the court on its own motion, perhaps prompted by your fellow jurist concurrence in Williams or the decision in Williams just two weeks ago, saw the problem. And now, upon reflection, I see that there is a problem. But I would like to – that is the issue before the court. If you say that there's not a piecemeal appeal here, this is a final order, how do you distinguish every other piecemeal appeal? How do you distinguish the ones where, for instance, they just want to keep a viable claim, they just want to appeal the ruling they didn't like, come back later, reassert their claims that they didn't appeal the first time? And that's the problem that you have. Now, I want to talk about J-5 a little bit, if I could, because that was a big chunk of what was discussed. And I would just say to the court that I hear that the Second Amendment petition and the federal complaint, the live federal complaint at paragraphs 244 and 258, said that ESPADA was performing operations on the Pocosa Creek 4 well and that ESPADA damaged the well, which was real property. And the live federal pleading says in numerous places it was not personal property because once the casing is in place, it's real property. So we have operations being conducted on the well, and the damage resulted from the operations and it was damage to real property. And I would suggest to this court that Admiral v. Cook, although it's not published and therefore it's not binding, it is absolutely persuasive. The reasoning is 100% correct. The court said the casing is part of the well, the damage occurred on the well, operation on the well. All this discussion of, well, they were working on this tube and not this part, the allegation was that ESPADA was working on the well, was pressurizing the well. And when you actually look at the specifics, you pressurize the entire well and it caused damage to the real property. Secondly, I would also suggest that Bayrock, despite CBX's reliance on it, also supports affirmance here. Why? Because Bayrock's analysis, they went through, they looked at J-5 and the court said, well, this is operations, damage to real estate, while the operations were being conducted, this would preclude coverage. But there was a conflict with an endorsement. And therefore the court said that endorsement, because there's an endorsement that creates coverage, that increases coverage, and there's a conflict, we won't enforce J-5. But let me tell you why in this case the Yerke endorsement, which was provided to the panel, I believe, at the request of CBX, does not conflict, doesn't create the kind of conflict that in Bayrock existed. First, it specifically identifies the endorsement, what's being modified. It's not merely adding coverage, it's modifying the terms of the policy. It's limiting the aggregate damages or the aggregate proceeds to a million dollars. Before the Yerke, it's two million, reduces it to one million. But it adds coverage for personal property that's below the subsurface, this is below the surface in the well. What is that? Numerous times during the drilling and completion of a well, there is subsurface personal property that go into the well to check the geology, to perforate the well, and so forth. And it's very expensive. This is typically the operator leases it from someone else. And if it's damaged, subsurface, the Yerke endorsement says, you have coverage. We're going to cover the cost of trying to pull it out to repair that subsurface equipment. But then what it does, it does a third thing. And it says, of the three things that we're modifying in this Yerke endorsement, limitations, definitions, and J4, only J4. It says, separately, all other provisions remain in effect. And not only that, it includes within that modified J4 essentially a restatement of J5. Why does it say that? Why does it go on to say in J4, you get coverage for subsurface personal property, but you don't get coverage for damage to real property during operations in that well? Why does it do that? Because a casing begins life as personal property. It's a piece of metal. And when you plant it in place in the well, it becomes real property. And what the policy avoids is any ambiguity as to whether that coverage that's provided for personal property, suddenly once it becomes a casing as it was here and part of the well and real property, there's no ambiguity. Then there's no coverage. J5 applies, and J5 precludes or excludes coverage for claims based on damage to real property during operations. Now, they cite, CBX cites a number of J6 cases, and it's very important, because the argument that you heard up here, well, they're just working on this pipe, or they're just working on this part of this pipe. J6, J4, J5, J6 are next to each other, but they cover different things. J4 is personal property in the possession, custody, or control of the insured. J5 is damage to real property during operations. And then J6 is the cost to restore, repair, or replace your work, work that the contractor did. So what happens in a case, for instance, like Bayrock, where unlike this case, in this case the well was shut down. There was nothing that was repaired, restored, or replaced. J6 never came into play, because no one was seeking the cost to restore, repair, or replace. But in Bayrock, it was. And in other cases that you'll see under J6, it was. And so when there is a total cost of property damage of a million dollars, let's say, the court has to get granular. The court has to decide what portion of this is restoring, repairing, or replacing the work you did. I'll give you an example. If a contractor builds a wall, and that wall defectively diverts water into a building and causes damage, and so you have a claim. Maybe, let's say, for ease of simplicity, a million dollars. And $500,000 is to repair that defective wall, and $500,000 is for the water damage. Under the cases that are before this court, what the cases say is, the cost of the wall, the $500,000, that's not insured, that's your work. But the damage that flowed from your defective work is covered. So to just seize on this one phrase, that particular part, that appears both in J5 and J6, does not mean that you should conflate the inquiry under J5 and J6. Here, under J5, there were operations that were occurring at the well site. Damage allegedly occurred to real property as a result. I have a couple questions about the second summary judgment ruling. The first one is, if we were to affirm, just hypothetically, the first summary judgment ruling, that there's no duty to defend or indemnify, why does the second issue still matter? If it turns out that coverage was excluded and there was no coverage? Right. If there's no coverage, why does the second summary judgment? Then the question of whether the trial court's judgment is admissible and binding on the insurer, it can't be, because there's no coverage. Right. So why did you all litigate it after the first summary judgment? It seems like that beat back all the coverage claims. Well, we still had, first off, we had the Iowa Insurance Code claim, so it wasn't completely done at that point. And it was a $105 million judgment that we sought to attack. Now, let me just say, and I was wanting to get to this, it defies common sense to believe that a default judgment could ever be held to be the product of a fully adversarial trial. It's a default judgment. My problem, both sides really talk about all these cases, the State Supreme Court cases like Gandy and Hamill that are more about collusive judgments where the lawyers are trying to collude, essentially, or at least agree not to set up a judgment that the insurance company is bound by. Here we just have non-action. It's a default judgment. So it seems to me it's a different situation. I don't know if you're familiar with the JHP case from our court. That seems to say that generally in this context a default judgment will be given validity. Well, Your Honor, what Hamill, which is more recent, said, and which is this court has to infer what the state of Texas would say. But Hamill doesn't talk about default, so I don't know why. I mean, for us to say it overrule, we'd have to say it overrule JHP. Do you agree with that? I would have to say that JHP to the extent is inconsistent, obviously Hamill has to prevail over it because your job here is to discern what the state of Texas says. But you would lose under JHP. No, Your Honor. I don't believe that we would lose under JHP because that JHP, as I recall, was decided with respect to— well, I'm sorry, Your Honor. It's in our briefing, and I've lost my train of thought. Well, tell me why JHP. But I would like to say with respect to Hamill, what Hamill says is that before Gandy, that it actually says, for instance, under Block, that a default judgment was, in fact, enforceable against the insurer in a subsequent proceeding. But after Gandy, what the question is, after Gandy, Hamill says, the question is whether the underlying judgment accurately reflects the plaintiff's damages and thus the insured loss owed by the insurer. And with respect to that, the judge below, the district court didn't make a finding based on whether or not someone could have shown up to court or had some issue with their finances. Because what the court specifically said was, following the rules in Gandy and Hamill, Judge Ezra said, was this judgment the product of a fully adversarial trial? And he looked at all the factors, and he said there were three factors that counseled against it. One was they didn't show up to contest liability. Two was they didn't show up to contest the amount of damages. And three was this almost— why they might not have. Because their own business manager testified that they had no meaningful financial stake in the outcome of the litigation. And I read Hamill, though, it still reinforces that the general rule in Texas is that if the insurer decides not to defend, it runs the risk of getting hit with a judgment it doesn't like. And then there's this narrow class of cases that fall outside of that. And I'm just not sure we can say a default does. But the risk is this, is that in many cases the defendant shows up and hotly contests liability and damages. And in those circumstances— but what Hamill said was if it's a default judgment, okay, if it's a Gandy-type situation, okay, it's not going to be admissible. But even if someone shows up and asks questions, we'll still be inclined to look behind to prevent against collusion. They didn't say we're going to find collusion or that you have to prove collusion. What they said was even if someone shows up and asks questions, under those circumstances, if they have entered into an agreement such that it's a show trial, it's not going to be binding and admissible against the insurer. And so, in this case, Your Honor, my time is up, but I would say, again, they're just properly held up. I missed it and you might have covered it. I thought Counsel Opposite somewhere along the line was saying— What's that, Your Honor? I'm trying to get to the question. I was trying to find it in my notes. I thought I heard—you may have addressed it, Counsel Opposite, say that you actually did defend for two years or something like that. Oh, yes, Your Honor. And just what was your—what's your response? Okay, so there's no—as the Court observed, as one of the questions observed, there's no legal import to that. There's no claim that for two years, despite the fact that you weren't obligated to provide coverage, you provided coverage in a defense. You paid for our lawyers for two years. There's no wrongful—there's no claim that's based on wrongfully providing free legal services. Whether—it's not in the record as to why initially they provided it and then later they looked closely and determined that it wasn't covered. I'll just tell you this. You could do it, but it's still—if you're relying on the policy provisions of no duty to defend, whether or not it's true or not, there was some defense in actuality. It's the language of the policy that would govern it. Is that what you're saying? Yes, Your Honor. I mean, for instance, I'll just give you an example, a real-world example. I sold a car a year ago. It was a car my daughter drove. I found out about six months ago that for six months I'd still been paying insurance on the car. Now, I didn't pay insurance because I was confused as to whether I owned the car. I knew I didn't own the car. I made a mistake in that circumstance. And in the commercial realities of the world, people are going to pay for things they don't need to pay for at times, and this court exists to make sure that they're not refusing to pay for things that they're required to pay for. But in this circumstance, it was the situation that for two years the defense was paid for, and then once the defense was withdrawn, it turned out they didn't – I mean, the summary judgment evidence is pretty clear. They didn't have the anywhere with all. They didn't have any continuing operations. They were deeply in debt and barred by the state of Texas from even operating it well. And their business manager said we had no – they'd be throwing good money after bad to even hire a lawyer. Okay. All right. Thanks for responding to my question. All right, counsel. And just to be sure, I am going to add to that context just provided, and this comes from the record. When the withdrawal letter was sent, 71 days before trial, ACE asserted 19 different reasons why coverage wasn't founded. All of those reasons but the two have been abandoned. Let me ask you – it's not the jurisdictional question, but it has some similar – it relies on some similar facts. Assume there is jurisdiction. But then if we affirm the first summary judgment, no duty to defend or to cover the loss, do we then have to reach the second issue? Because doesn't your dismissal of the statutory claim mean that's no longer in the case? Again, apart from the jurisdictional, but doesn't your dismissal of the statutory claim mean if that second summary judgment only matters for damages for a statutory claim that's no longer in the case, why do we address it? Just to be sure, I believe that the statutory claim is still part of this case. But you dismissed it without prejudice. Maybe you can bring it back later, but not – okay. We ineffectively dismissed it without prejudice because Rule 41 didn't enable us to cut out – this is footnote two to Ryan, so we're – I know what you're talking about, but you want us to – where did you ask us in your brief to undo the dismissal? There was no need to undo it. What should we do if you're right that the dismissal is ineffective? What do we do? Well, we're asking you to – our relief is to find that there's coverage and to find that the underlying judgment is binding. That's the relief we've requested, and then we would remand. But you want us to say the dismissal is void? There's no need. It is just void. Okay. All right. Courts usually look at what orders say, and there's an order saying it's dismissed. So if we don't undo that, I don't see how you're just going to get rid of it. But Schumacher, the Eleventh Circuit in Schumacher said just that. As a result, the Rule 41 not enabling this, it's just – That's what I'm getting at. The circuit court had to say that, though. So what do you want us to say? Then I would – yes, I believe that that would be appropriate for this panel to say that. Similar to what Schumacher did, yes. Now, counsel asked, how do you distinguish cases for appeal? So with regard to Ryan, the answer is, was there a final judgment that provided res judicata effect as to all claims and parties? That's the answer. In Ryan, there was no final judgment. In Marshall, there was no final judgment. There were attempts at entering the final judgment, but they weren't effective as a result of the operation of Rule 41. In Williams, there was no final judgment. Well, there was final judgment as to some parties, but once those parties were released, they couldn't get back out and there couldn't be a final judgment as to the entire action. So the simple answer to the question, how do you distinguish? Was there a final judgment that provided res judicata effect as to all claims asserted in the live complaint? And that's what we have here in this. We have a final judgment that says plaintiff takes nothing. All actions are dismissed. The entire action is dismissed on the merits. All relief not granted is denied. So your argument is that you can have ten claims in a case. You lose claim one on a motion to dismiss. You lose your contract claim on a motion to dismiss. And then you say, oh, I'm going to dismiss without prejudice my nine other claims. Court says okay. Then it enters a final judgment. You would say you can appeal that because there's a final judgment with claim preclusive effect. As a result of Rule 41 not enabling a party to do that, number one, and number two, the final judgment would forever bar those other claims. Yes. But no one's ever been allowed to do that. I mean, you can dismiss the vast majority of your claims just because there's one ruling on a Rule 12. I mean, that just completely undercuts the final judgment rule because you can get one preliminary ruling on a motion to dismiss and take it up on appeal under your theory. But there's finality as to the action. Okay. I mean, that is your theory, but I'm saying you agree in my scenario that would, any time a party loses one of many claims, they could manufacture, as the case law says, a final judgment by dismissing the others without prejudice and basically get an interlocutory appeal. Well, where there's a final judgment that says the entire action is dismissed and therefore there's res judicata as to all the claims, yes. Okay. You've got a red light, Mr. Faisal. I'll give you one closing sentence, a declarative sentence with not semicolons or— I would just ask the court to remember this sentence in Roman numeral A, B, second sentence, any payment for property damage under this endorsement, meaning this UREC provides coverage for the very claims that are asserted and are not susceptible to the exclusions proposed by ACE. All right. All right. Thank you, counsel, both sides for your main briefing and the supplemental briefing on the question put to you. The case will be submitted along with the other arguments.